UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ASHLEY WILMOTH,

        Plaintiff,

v.

HFE 5 LLC; LEFTY'S VENTURES, LLC;
LEFTY'S HOLDINGS, LLC; and
HUSSEIN 'SAM' BERRY,

        Defendants.
_____/

Civil Case No. 23-cv-11430

HON. MARK A. GOLDSMITH

**OPINION & ORDER GRANTING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (Dkt. 25)**

Plaintiff, Ashley Wilmoth, filed this lawsuit against Defendants HFE 5 LLC (HFE) and Hussein "Sam" Berry claiming unpaid overtime wages in violation of the Fair Labor Standards Act (FLSA), 29 U.S.C. § 201, et seq., and the Michigan Workforce Opportunity Act (MWOA), Mich. Comp. Law § 408.411, et seq.; retaliation in violation of FLSA and the Michigan Whistleblowers Protection Act (MWPA), Mich. Comp. Law § 15.361, et seq.; and wrongful discharge in violation of public policy, after her employment at Lefty's Cheesesteaks was terminated. Before the Court is Defendants' motion for summary judgment (Dkt. 25). For the reasons that follow, the Court grants Defendants' motion.[1]

---

[1] Because oral argument will not aid the Court's decisional process, the motion will be decided based on the parties' briefing. See E.D. Mich. LR 7.1(f)(2); Fed. R. Civ. P. 78(b). In addition to the motion, the briefing includes Wilmoth's response (Dkt. 27) and Defendants' reply (Dkt. 28).

1

## I.     BACKGROUND

Ashley Wilmoth was an Assistant Manager at Lefty's Cheesesteaks, owned and operated by HFE 5 LLC (HFE) and Hussein "Sam" Berry until she was terminated in March 2023. Compl. ¶ 14, 28 (Dkt. 1). She first began working at Lefty's in September 2022 while the store was under different management. Id. ¶ 15. Three months later, in December 2022, the store was acquired by HFE and Berry from a former franchisee. Mot. Summ. J. at PageID.353. Berry retained Wilmoth as an employee under the title of Assistant Manager, with an hourly wage of $16/hour. Id. at PageID.353–354.

In addition to her role as an Assistant Manager, Berry contends that Wilmoth separately worked as an independent contractor to provide cleaning services for the store because she "had her own cleaning company." Berry Dep. at PageID.376 (Dkt. 25-2). The store's general manager, Calvin Taylor, corroborated that Wilmoth "had a cleaning company" and that "[s]he would come in and clean the store" separately from her role as a manager. Taylor Dep. at PageID.504–505 (Dkt. 25-4). Wilmoth denies this arrangement and claims that all her hours working in the store were in her role as an Assistant Manager. Wilmoth Dep. at PageID.438–439 (Dkt. 25-3) ("Q: Did you ever clean the store in any capacity? A: Yes. Q: Like as—separate and apart from your daily job duties as a Lefty's employee. A: No.").

According to Berry, Wilmoth was paid separately for her role as an Assistant Manager and as an independent contractor. Berry Dep. at PageID.376. For the time she worked as an Assistant Manager, Wilmoth received "payroll checks" that were prepared by an independent payroll company based on an accounting of hours provided by Berry. Id. at PageID.374–375, 378. By contrast, Wilmoth's cleaning services as an independent contractor were paid for in the form of "written-out" company checks signed by Berry, also at a rate of $16/hour. Id. at PageID.376.

Wilmoth disputes this and notes that the "written-out" checks were for "full hours [that] were not all added to payroll the way that they were supposed to be." Wilmoth Dep. at PageID.445.[2] Wilmoth's work schedules reflect that she routinely worked more than 60 hours per week, see Schedules (Dkt. 25-6), and Wilmoth suggests that all of these hours were in her role as an Assistant Manager and Berry split her pay between payroll and personal checks to avoid paying overtime, Wilmoth Dep. at PageID.445. By contrast, Berry alleges that the schedule reflected both Wilmoth's time serving in her role as an Assistant Manager and in her role as an independent contractor and that she received full pay that she was entitled to in both roles. Berry Dep. at PageID.381, 383 ("Q: So you're telling me that there's time on this schedule that is actually her cleaning the store—; A: Yes."). However, Berry noted that there was no record that would distinguish between the hours worked by Wilmoth as an Assistant Manager versus an independent contractor. Id. at PageID.383.

Wilmoth claims that she raised concerns about the lack of overtime pay and receiving a portion of her pay via non-payroll checks in January 2023. Wilmoth Dep. at PageID.445–446. Berry allegedly responded that the reason for this arrangement was that "if he were to document of all [her] hours on payroll, not only would [he] get a lot of taxes taken out, but he would have to pay [Wilmoth] time and a half." Id. at PageID.445. Wilmoth alleges that in the course of this conversation, Berry agreed to increase her hourly rate to $18/hour in exchange for her assurance that she would not "tell anybody." Id. at PageID.446. Berry not only denies making any such

---

[2] Wilmoth also alleges that the schedules underestimated the hours she worked—for example, she claims that on occasion she would work nearly two hours after store closure but would not report them because Berry was "emotionally abusive, very verbally abusive" and she did not feel "safe" to ask him for compensation for these hours. Wilmoth Dep. at PageID.451. By contrast, Taylor contends that from his experience, "[t]here has never been a time" where closing should take "longer than twenty minutes." Taylor Dep. at PageID.507 ("[E]very time we would close we would be out in about fifteen minutes after, if that.").

statement but also recalls that he only raised Wilmoth's pay from $16/hour to $18/hour because she approached him with concerns that the store was "getting busier" and she "d[idn't] know how much more [she] c[ould] handle." Berry Dep. at PageID.380. In addition, text messages document that Wilmoth requested this increased pay in a message to Berry on February 6th and the raise was not effective until the end of February. Wilmoth Dep. at PageID.476–478. Regardless, Wilmoth concedes that she did not have any additional discussion with Berry or Taylor about her concerns regarding overtime pay until after she was terminated. Id. at PageID.484.

By March of 2023, Taylor noted that he began to receive complaints "from other staff members . . . [of] how toxic of a workplace it was working with [Wilmoth]" to the extent that "people were either fired or quitting because they no longer wanted to work on her shift." Taylor Dep. at PageID.508. Taylor also commented that he had observed Wilmoth "being rude to customers," and that there were "talks" with Berry of "put[ting] a plan in motion to . . . find someone to bring in" to replace Wilmoth. Id. at PageID.511. Berry too alleges that by March, he began to consider firing Wilmoth because she was "talking to people worse than how she usually talks to people." Berry Dep. at PageID.380. Around the same time, Wilmoth also alerted Taylor that she had received a job offer from another firm, Stellantis, and that she would resign from her employment with HFE as soon as she received a start date.[3] Wilmoth Dep. at PageID.426–427.

On March 24, 2023, Taylor and Berry were informed that "there was some sort of altercation" involving Wilmoth and either a customer or a staff member and that Wilmoth had left the store in the middle of her shift. Taylor Dep. at PageID.513–514 ("It was basically like she just—there was some sort of altercation— . . . and she ended up just walking off."). Wilmoth then

---

[3] Wilmoth would eventually begin her employment with Stellantis on April 18, 2023. Wilmoth Dep. at PageID.426.

4

came to work the following day on March 25, but informed Taylor that she would have to leave for a "roofing issue" and with no advance notice, left early again. Id. at PageID.514. On March 26, Taylor claims that he still expected Wilmoth to show up for work, but she did not and that was "kind of like the last straw." Id.

Meanwhile, Wilmoth sent a message to Berry on March 25 saying that she had just learned from another employee that she was "not a manager anymore" and had been demoted. Wilmoth Dep. at PageID.480. Berry responded "Stop texting me, please. I will discuss this in person. You walked out on your job yesterday." Id. at PageID.479. In subsequent messages, Berry alleged: "You were told repeatedly and talked to repeatedly on how to take care of your duties and you don't." Id. at PageID.481. He also alleged that she had "made the work environment very toxic and nobody want[ed] to work with [her]." Id. at PageID.483. Berry then terminated Wilmoth over text. Id. at PageID.484. None of the text messages between Berry and Wilmoth reference overtime pay until after Wilmoth was terminated, a fact that she concedes. Id. ("Q: The first time that there's any mention about overtime in these texts between you or [Berry] is this one after you've already terminated, correct? A: Correct.").

Wilmoth does not reference any early departure from her job on March 24 but alleges that she received permission from Taylor to leave early on March 24 because "[she] had roofers at [her] house." Id. at PageID.480. ("I did not walk out on my job. I got it okayed from the general manager and the other store manager."). She claims that Berry was simply "trying to find a reason" and that "he pulled [it] out of the air" that she had walked out of work. Id. That said, in her deposition, Wilmoth acknowledged that "there were times" before her termination where Berry had expressed concerns about her job performance to her, and that if a store manager "walks off

5

the job . . . the employer has a justifiable reason for removing that person as a manager." Id. at PageID.481.

Wilmoth contacted the Wage and Hour Division of the Department of Labor prior to her termination, id. at PageID.424, but concedes that she never alerted Berry or anyone at HFE about contacting the Wage and Hour Division, id. at Page ID.483. The Department of Labor did conduct a review of wage violations at the store later in the year and following a full audit, the Department "found no violations for unpaid wages, including overtime." Mot. Summ. J. at PageID.356, n.7. For her final paycheck, Wilmoth received a payroll check with overtime compensation for 2.5 hours. Wilmoth Dep. at PageID.484.

Following her termination, Wilmoth brought this action alleging unpaid overtime wages in violation of FLSA and MWOA (Counts I and III), retaliation in violation of FLSA and MWPA (Counts II and IV), and wrongful discharge in violation of public policy (Count V). Compl. ¶¶ 30–74. Defendants moved for summary judgment on Counts II, IV, and V. Mot. Summ. J. at PageID.345. Wilmoth voluntarily agreed to dismissal of Counts IV and V. Resp. at 14.[4] Thus, only Wilmoth's claim of retaliation in violation of FLSA (Count II) is at issue in this motion. For the reasons outlined below, the Court grants Defendants' motion.

## II. ANALYSIS[5]

The FLSA prohibits an employer from "discharg[ing] . . . [an] employee because such employee has filed [a] complaint or instituted . . . any proceeding under [FLSA]." 29 U.S.C.

---

[4] These claims are therefore dismissed with prejudice.

[5] In assessing whether a party is entitled to summary judgment, the Court applies the traditional summary judgment standard as articulated in Scott v. Harris, 550 U.S. 372, 380 (2007). If a movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," the Court will grant the motion. Fed. R. Civ. P. 56(a). If the movant makes an initial showing that there is an absence of evidence to support the nonmoving party's

§ 215(a)(3). To prevail on a retaliation claim, a plaintiff must either show "direct evidence of retaliation or circumstantial evidence of retaliation." Mansfield v. City of Murfreesboro, 706 F. App'x 231, 235 (6th Cir. 2017) (punctuation modified). "Direct evidence" is such that can "prove[] the existence of a fact without any inferences or presumptions," Abbott v. Corwn Motor Co., Inc., 348 F.3d 537, 542 (6th Cir. 2003) (punctuation modified), such as "blatant remarks" revealing a retaliatory intent, Mansfield, 706 F. App'x at 235–236. By contrast, a retaliation claim involving "circumstantial evidence" is governed by the burden-shifting analysis outlined in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 793 (1973); Adair v. Charter Cnty. Of Wayne, 452 F.3d 482, 489 (6th Cir. 2006). Under this framework, the plaintiff-employee first has the burden of establishing a prima facie case of retaliation by showing that: (i) "she engaged in a protected activity under FLSA;" (ii) "her exercise of this right was known by the employer;" (iii) "the employer took an employment action adverse to her; and (iv) there was a causal connection between the protected activity and the adverse employment action." Adair, 452 F.3d at 489. If a plaintiff presents sufficient evidence to establish a prima facie case, "the burden then shifts to the defendant to" articulate a "legitimate, non-discriminatory reason for the adverse employment action." Id. If so, the burden then shifts back to the plaintiff to prove "by a preponderance of the evidence that the" proffered reason was not the true reason for the employment decision and merely a pretext. Id. (citing Kocsis v. Multi-Care Mgmt., Inc., 97 F.3d 876, 883 (6th Cir. 1996)).

Wilmoth offers no direct evidence of retaliation and the parties therefore contest whether there is sufficient indirect evidence to make a prima facie showing of discrimination. Wilmoth alleges that her conversation with Berry in January 2023 alerting him that "he would have to pay

---

case, the nonmovant can only survive summary judgment by presenting evidence showing there is a genuine issue for trial. Celotex Corp. v. Catrett, 477 U.S. 317, 324–325 (1986).

7

[her] time and a half" for overtime work was protected activity and that Berry treated her "poorly," including "'nit-pick[ing] certain things' regarding her performance" and eventually terminating her two months later in March 2023, as retaliation for this conversation. Resp. at 16–18, 21. Wilmoth relies on the "temporal proximity between her protected activity" and termination to support her claim of causation. Id. at PageID.587. By contrast, Defendants deny any causal connection between Wilmoth's alleged January 2023 conversation and her termination because (i) "Berry responded to this alleged comment by giving her a raise," not retaliating against her, (ii) Wilmoth received all overtime compensation she was due, such as in her final paycheck, and (iii) Wilmoth was terminated because she walked off her job on March 24. Mot. Summ. J. at PageID.362. The Court concludes that even if Wilmoth raised concerns of overtime pay with Berry in January 2023, she has failed to establish a prima facie case of retaliation under FLSA because she has offered no evidence that would support an inference of a causal connection between her alleged complaint and her termination more than two months later. Because Wilmoth has not established a prima facie case, the Court does not need to engage in the burden-shifting analysis or inquire into the possibility of pretext.

i. **Protected Activity**

The FLSA protects not just "formal proceedings" initiated by an employee with the EEOC or the Department of Labor, but also "unofficial assertion [of] rights through [informal] complaints at work." See E.E.O.C. v. Romeo Cmty. Schs., 976 F.2d 985, 989 (6th Cir. 1992) (punctuation modified); Moore v. Freeman, 355 F.3d 558, 562 (6th Cir. 2004) ("[T]he anti-retaliation provisions of the FLSA can be triggered by informal complaints."). Wilmoth alleges that she complained to Berry in January 2023 that "if he were to document all of [her] hours on payroll, not only would [she] get a lot of taxes taken out, but he would have to pay me time and a half." Wilmoth Dep. at

8

PageID.445. Berry denies that this conversation took place. See Mot. Summ. J. at PageID.356 n.5. However, Defendants' briefing does not refute that Wilmoth engaged in protected activity and *only* focuses on the causation element of the prima facie framework. See Mot. Summ. J. at PageID.361 ("Plaintiff cannot establish a prima facie case because she cannot establish a causal connection between any complaint about wages or overtime and her termination."). Because Defendants do not expressly counter Wilmoth's claim and do not meet their burden of showing an absence of disputed material facts regarding this alleged conversation, see Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986), the Court accepts Wilmoth's version of the alleged conversation for the purposes of this summary judgment motion.[6] Thus, Wilmoth can raise a FLSA retaliation claim on the basis of her alleged conversation with Berry relaying her concerns of overtime pay.[7]

### ii. Adverse Employment Action

To sustain a FLSA retaliation claim, a plaintiff must suffer an employment action that is "materially adverse" such that "it well might have dissuaded a reasonable worker from making" a FLSA complaint. See Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006) (punctuation modified). This requires the employment action to be "more disruptive than a mere inconvenience or an alteration of job responsibilities," such as "decrease in wage or salary, a less

---

[6] In fact, in their reply briefing, Defendants concede that "[t]he alleged protected activity in this matter is limited to a single conversation that occurred at least two months before Plaintiff was terminated." Reply at PageID.724.

[7] Wilmoth also claims that she contacted the Department of Labor, before her termination at Lefty's, regarding overtime pay. Wilmoth Dep. at PageID.424. While a formal report would certainly qualify as protected activity, Wilmoth concedes that she did not tell Berry or anyone at HFE about the report, Wilmoth Dep. at PageID.483. And Wilmoth's briefing does not rely on this report as protected activity for the basis of her retaliation claim. See Resp. at PageID.12–13 (accepting Defendants' qualification that Wilmoth did not tell Berry or anyone else at HFE about the report).

9

distinguished title, a material loss of benefits, [or] significantly diminished material responsibilities." Pettit v. Steppingstone, Ctr. for the Potentially Gifted, 429 F. App'x 524, 532 (6th Cir. 2011) (quoting Kocsis, 97 F.3d at 886 and Bowman v. Shawnee St. Univ., 220 F.3d 456, 461–62 (6th Cir. 2000)). Termination of employment certainly rises to the level of an adverse employment action. Adair, 452 F.3d at 490. But "mere inconvenience or an alteration of job responsibilities," id., such as "increased scrutiny of an employee's work" is insufficient, Ruth v. Shelby Cnty. Fed. Credit Union, No. 09-2795-STA, 2010 WL 4922635, at *10 (W.D. Tenn. Nov. 29, 2010).

Wilmoth alleges that in addition to her eventual termination—which Defendants concede qualifies as adverse employment action for a FLSA claim—she suffered adverse action as "Berry began to more closely scrutinize" her work such as "com[ing] into the store and 'nit-pick[ing] certain things' regarding her performance" and "be[ing] critical of her conduct without having previously trained her or giv[ing] her any guidance on expectations." Resp. at 21; Wilmoth Dep. at PageID.477–478. In so doing, Wilmoth resorts to conclusory statements that "[n]ot only did Berry treat [her] poorly after she requested overtime, but he also made comments insinuating that she should not have asked [for overtime pay]." Resp. at 21. However, Wilmoth offers no evidence to suggest that she was "materially" affected by such "nit-pick[ing]" or "critic[isms]" or that she was selectively targeted for such criticisms. See Wilmoth Dep. at PageID.451 (acknowledging that Berry had a general habit of "treat[ing] his employees . . . very, very poorly" such as "scream[ing] at people, yell[ing] at people, cuss[ing] at people, and threaten[ing] people"). On the contrary, during this period, Wilmoth received an increase in her hourly wage from $16/hour to $18/hour, even as at least three other employees were terminated from the store. Wilmoth Dep. at PageID.477–478. Wilmoth's subjective and speculative beliefs of being targeted, "without

10

affirmative evidence" cannot be used to establish adverse employment action. Adair, 452 F.3d at 491. Accordingly, only Wilmoth's termination qualifies as adverse employment action that is actionable for her retaliation claim.

### iii. Causation Between Protected Activity and Adverse Employment Action

Accepting that Wilmoth engaged in protected activity under FLSA and suffered adverse employment action in being terminated, her prima facie case of retaliation fails because she has not met her burden of establishing a causal relationship between the protected activity and adverse employment action. Wilmoth suggests that temporal proximity between her alleged conversation with Berry in January 2023 and her termination in late March 2023 establishes causation. See Resp. at 19. However, temporal proximity between an alleged protected activity and adverse employment action is only sufficient to give rise to an inference of causation when "employers . . . retaliate swiftly and immediately upon learning of protected activity" such that "little other than the protected activity could motivate the retaliation." Mickey v. Zeidler Tool & Die Co., 516 F.3d 516, 525 (6th Cir. 2008) (collecting cases finding causation when the protected activity and adverse action occurred within "only 13 days" and "less than three weeks"). These are "limited" and "rare cases," id. at 525–526, and an "intervening legitimate reason" to take an adverse employment action "dispels an[y] inference of retaliation based on temporal proximity," Wasek v. Arrow Energy Servs., Inc., 682 F.3d 463, 472 (6th Cir. 2012); Parks v. City. Of Chattanooga, 74 F. App'x 432, 438–439 (6th Cir. 2003) (refusing to find causation for a Title VII retaliation claim when the plaintiff was "fired approximately two months after he sent his complaints to [his supervisors]" but there were other non-retaliatory grounds for termination).

For example, in Wasek, an oil rig worker complained about sexual harassment but was subsequently terminated after he left his worksite without authorization and "did not show up as

11

assigned." 682 F.3d at 467. The Sixth Circuit upheld the district court's grant of summary judgment for an absence of causation because the unauthorized departure was an "intervening event" that gave the employer "a legitimate reason to discipline [the employee]" and an inference of causation based on temporal proximity was therefore not justified. Id. at 472; see also Kuhn v. Washtenaw Cnty., 709 F.3d 612, 628 (6th Cir. 2013) (holding that the employee's "extended discretionary leave and his failure to return to work" were an "intervening reason for the County to terminate his employment" and that "temporal proximity" could not be used to establish causation for a retaliation claim); Kenney v. Aspen Techs., Inc., 965 F.3d 443, 451 (6th Cir. 2020) (holding that "vague assertions, coupled with a conjectural timeline, do not overcome the otherwise largely undisputed point that the employee complaints against her were an intervening cause between her [] protected activity and her termination").

Defendants argue that there were several intervening events that justified Wilmoth's termination. See Mot. Summ. J. at PageID.362. As Taylor noted, there were numerous concerns raised by other employees about Wilmoth's job performance—including some who may have left rather than continue working with Wilmoth, see Taylor Dep. at PageID.508, 511, and Berry specifically referenced that Wilmoth "made the work environment very toxic" in his text messages to Wilmoth when he terminated her, see Wilmoth Dep. at PageID.483; see also Kenney, 965 F.3d at 450 (holding that complaints filed against the plaintiff and "documented instances of [other] employees leaving due to [plaintiff's] management style" are "intervening cause[s] justifying [plaintiff's] termination"). And, on March 24, Berry was alerted that Wilmoth had walked off the job without permission, and he immediately terminated Wilmoth following this conduct. Berry Dep. at PageID.398. Not only did Wilmoth herself opine that an employer may be justified in terminating a manager for walking off the job, see Wilmoth Dep. at PageID.481, but Berry's

12

"honest belief" that Wilmoth walked off her job without permission is a "legitimate reason" to justify a termination decision,[8] see Nathan v. Great Lakes Water Auth., 992 F.3d 557, 572 (6th Cir. 2021) ("If an employer holds an honest belief that an adverse employment action is justified for a legitimate reason, summary judgment in their favor is appropriate.") (punctuation modified); Wasek, 682 F.3d at 472 (finding an employee's unauthorized departure from work to be an "intervening event" that provided "a legitimate reason to discipline [the employee]" and from which causation could not be inferred).

By contrast, Wilmoth has not met her burden of showing that her January 2023 conversation had any connection to her decision to "walk off" or her termination. In fact, she expressly acknowledged that Berry had previously expressed concerns of her job performance to her, see Wilmoth Dep. at PageID.481, and that there were no references whatsoever to overtime pay in any of Wilmoth's messages to Berry until after she was terminated, id. at PageID.484. Wilmoth has failed to provide any evidence that would dispel the inference that her termination decision was not motivated by her performance or conduct at work and instead related to her January 2023 conversation with Berry about overtime pay. Thus, she fails to meet the causation element necessary for a prima facie case of retaliation.

---

[8] Wilmoth only contests that she did not walk off the job on March 24, alleging that she received permission from Taylor to leave early. Wilmoth Dep. at PageID.480. She does not address her alleged altercation or departure on March 24 or contest that Berry may have been informed of such an incident. Id. ("Q: Do you know that Sam received a different account of what happened that day and was told that you did walk out on your job and— A: I was not aware. Q:—it was a big scene? A: I was not aware of that. No."). Wilmoth also does not contest that Berry was told that she walked off the job on March 24 without permission and may have acted on that knowledge. In fact, her briefing notes that Berry terminated Wilmoth "based upon an erroneous report that she had walked off the job the day before." Resp. at 12.

### III. CONCLUSION

For the reasons set forth above, the Court grants Defendants' motion for summary judgment with respect to Wilmoth's claims for retaliation under FLSA.

Dated: March 30, 2025　　　　　　　　　　　　s/Mark A. Goldsmith
　　　　Detroit, Michigan　　　　　　　　　　　MARK A. GOLDSMITH
　　　　　　　　　　　　　　　　　　　　　　　United States District Judge

### CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on March 30, 2025.

　　　　　　　　　　　　　　　　　　　　　　　s/Carolyn Ciesla
　　　　　　　　　　　　　　　　　　　　　　　Case Manager